**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.:18-cv-10203-JEM**

UNITED STATES OF AMERICA,

        Plaintiff/Counter-Defendant,

v.

F.E.B. CORP., a Florida Corporation,

        Defendant/Counter-Plaintiff.

_____/

**F.E.B. CORP.'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

Defendant/Counter-Plaintiff, F.E.B. Corp., files its Answer, Affirmative Defenses and Counterclaim, in response to Plaintiff/Counter-Defendant the United States' Complaint, and states:

1. Admit.

2. Admit that both parties claim title, but deny that the "Subject Property" is quite as described. Only 21.9 acres of the approximately 39 acres are actually "upland" and the remaining 17.08 acres are actually sea bottom which is/were not dredge spoils. The following responses to the allegations are subject to the same clarification of the "Subject Property" description.

3. Admit.

JURISDICTION AND PARTIES

4. Admit.

5. Admit.

6. Admit.

1

<u>VENUE</u>

7.   Admit.

8.   Admit.

9.   Admit.

<u>FACTUAL ALLEGATIONS</u>[1]

10.  Admit.

11. Admit.

12. Admit.

13. Denied.

14. Denied.

15. Denied as to "acquired" and "shoal;" admitted as to non-existence.

16. Denied.

17. Admit.

18. Admit.

19. Denied.

20. Denied.

21. Admit as to the authenticity of the letter; otherwise denied.

22. Admit.

23. Admit.

24. Admit.

25. Admit as to the language of the letter; otherwise denied.

---

[1]     The narrative headings set forth in the Complaint are not allegations and they are therefore omitted from this Answer.

26. Admit.

27. Admit as to the authenticity of the correspondence; otherwise denied.

28. Admit.

29. Admit.

30. Admit as to the authenticity of the language; denied as to conclusions.

31. Denied.

32. Admit.

33. Admit.

34. Admit that a ship sank; denied that it "ran aground" on the Subject Property.

35. Admit that the Subject Property is sometimes referred to as "Wisteria Island".

36. Admit.

37. Without knowledge and therefore denied.

38. Admit project was completed; without knowledge as to the date.

39. Denied.

40. Admit as to the authenticity of the correspondence; otherwise denied.

41. Admit.

42. Notice is Admitted; Denied that the property described in the Notice was "improved" or describes or sets forth the legal description of the Subject Property, or any part thereof.

43. Denied.

44. Denied that the Subject Property was advertised for sale; admitted that the Navy filed objections to the proposed sale.

45. Admit.

46. Admit only that Navy objected to [the Trustees]; otherwise denied.

47. Denied that the sale was of the Subject Property; admit that the Trustee withdrew the property described in the Notice from sale.

48. Denied that the property to be sold was the Subject Property; admit that TIIF Minutes are attached.

49. Admit only as to the authenticity of Exhibit 13; otherwise denied.

50. Admit only as to the authenticity of Exhibit 13; otherwise denied.

51. Admit.

52. Admit only as to the authenticity of the letter; otherwise denied.

53. Admit only as to the authenticity of Exhibit 14; otherwise denied.

54. Admit.

55. Admit only as to the authenticity of the Executive Order; otherwise denied as to conclusions.

56. Admit.

57. Admit.

58. Denied.

59. Denied.

60. Denied.

61. Admit.

62. Admit that a Revocable License was issued that did not involve the Subject Property; otherwise denied.

63. Admit.

64. Admit.

65. Admit.

66. Admit that the dredging was to create a seaplane basin and turning basin to be used by the Navy, but denied that this dredging was only for Naval use.

67. Admit.

68. Admit.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Admit only as to the authenticity of the letter; otherwise denied.

74. Admit.

75. Admit.

76. Admit.

77. Denied.

78. Admit.

79. Admit.

80. Admit.

81. Admit.

82. Admit.

83. Admit.

84. Admit.

85. Admit.

86. Admit.

87. Admit.

88. Admit.

89. Admit only as to what the letter states; otherwise denied.

90. Admit only as to what the letter states; otherwise denied.

91. Admit.

92. Admit.

93. Admit only as to what the letter states; otherwise denied.

94. Admit only as to the authenticity of the letter; otherwise denied.

95. Admit only as to the authenticity of Exhibit 25.

96. Admit that the TIIF issued a Trustees' deed; otherwise denied. The document speaks for itself.

97. Admit as to authenticity of the Exhibit; denied as to the characterization of the document. The document speaks for itself.

98. Denied.

99. Denied.

100.  Admit title originates with the TIIF deed; denied it is dependent upon the deed; otherwise denied as to the characterization of the document.

101.  Denied.

102.  Admit.

103.  Without knowledge and therefore denied.

104.  Without knowledge and therefore denied.

105.  Admit Eisenhower won the election; without knowledge of his platform and therefore denied.

106.  Without knowledge and therefore denied.

107.  Without knowledge and therefore denied.

108.  Admit.

109.  Without knowledge as to whether the testimony attached is all the testimony of Secretary
Anderson but admitted that certain testimony of Secretary Anderson is attached.

110.  Admit as to the words stated; otherwise denied.

111.  Admit.

112.  Admit as to the words stated; otherwise denied.

113.  Denied.

114.  Denied.

115.  Admit.

116.   Without knowledge as to whether the testimony attached is all the testimony of Admiral
Nunn but admitted that certain testimony of Admiral Nunn is attached.

117.  Admit as to the words stated; otherwise denied.

118.  Admit as to the words stated; otherwise denied.

119.  Without knowledge and therefore denied.

120.  Admit.

121.  Denied.

122.  Without knowledge as to whether the testimony attached is all the testimony of Attorney
General Brownell, but admitted that certain testimony of Attorney General Brownell is
attached.

123.  Admit.

124.  Admit as to the words stated; otherwise denied.

125.  Without knowledge and therefore denied.

126. Admit as to the words stated; otherwise denied.

127. Admit.

128. Admit.

129. Without knowledge and therefore denied.

130. Admit.

131. Admit as to the words stated; otherwise denied.

132. Admit as to the words stated; otherwise denied.

133. Admit as to the words stated; otherwise denied.

134. Admit.

135. Admit.

136. Admit.

137. Denied.

138. Admit.

139. Admit.

140. Admit.

141. Admit.

142. Admit as to the words stated; otherwise denied.

143. Admit.

144. Admit as to words stated; otherwise denied.

145. Admit.

146. Admit.

147. Admit.

148. Admit.

149.  Admit as to the words stated; otherwise denied.

150.  Admit as to the words stated; otherwise denied.

151.  Admit as to the words stated; otherwise denied.

152.  Admit.

Count I.
(Declaratory Judgment to Quiet Title)

153.  Admit and F.E.B. hereby re-alleges and incorporates by reference its above responses to

paragraphs 1-152, as fully as if such responses were set forth herein.

154.  Denied.

155.  Denied.

156.  Admit.

157.  Denied.

158.  Denied.

159.  Denied.

160.  Admit.

161.  Denied.

162.  Denied.

163.  Admit.

164.  Denied.

165.  Denied.

166.  Admit.

167.  Denied.

168.  Denied.

169.  Denied.

170. Denied.

Any allegation of the Complaint not specifically admitted, is denied.

WHEREFORE, the Defendant respectfully requests that the Court deny the request for declaratory judgment quieting title to the United States and pursuant to the Counterclaim set forth below, quiet title in favor of the F.E.B. Corp.

## AFFIRMATIVE DEFENSES

**First Affirmative Defense**

The State of Florida has held right, title and interest to the Submerged Lands within Florida's boundaries, including the submerged lands at issue in this case, since 1845. In 1845 the Florida Legislature created the Board of Trustees of the Internal Improvement Trust Fund (TIIF) which held title to Florida's costal submerged lands, including the submerged lands at issue in this case. On January 9, 1952, the Internal Improvement Fund granted a deed to the 39 acres of lands within the navigable waters of Florida which encompassed the property at issue in this case.

The Defendant F.E.B. subsequently acquired title to that deeded property and presently possesses the legal right, title and interest in the property at issue in this case.

**Second Affirmative Defense**

Title 43 United States Code § 1301, *et seq*., (1953 Submerged Lands Act) states, in pertinent part, that "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, … [are] recognized, confirmed, established, and vested in and assigned to the respective States … and [their] respective grantees, lessees, or successors in interest." F.E.B. Corp. is within the descriptions set forth in the statute. The statute further provides that the "United States releases and relinquishes unto said States [and their respective grantees,

10

lessees, or successors in interest]. . . . all right, title and interest of the United States … to all said lands, improvements, and natural resources." *See*, 43 U.S.C. §1311(a) and (b).

Therefore, the United States may not claim title to the property at issue in this case.

**Third Affirmative Defense**

A Submerged Lands Act exception addressed "all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and any rights the United States has in lands presently and actually occupied by the United States under claim of right." Title 43 U.S.C. §1313(a). The property at issue in this case was not filled in, built up, or otherwise reclaimed by the United States for its own use, nor was it "presently and actually" occupied by the United States.

The "exception" to the Submerged Lands Act has no application in this case and does not undermine, contradict, or otherwise impugn or impair F.E.B. Corp.'s deed and title to the property at issue. The Complaint's allegations relating to "installations of the Federal Government" (¶126) suggesting that an unimproved island created by depositing spoil is an "installation" demonstrate that the "exception" has no application here because an "installation" is not a spoil deposit.

**Fourth Affirmative Defense**

The Plaintiff's claim is barred and precluded by its failure to comply with Rule 13(a), Federal Rules of Civil Procedure. The Plaintiff's instant action was a compulsory counterclaim which was required to have been asserted in its Answer to the Complaint filed by F.E.B. Corp., in this Court in 2012, in a case styled *F.E.B. Corp., v. United States*, Case No.: 12-cv-10072-JEM. The instant case now brought in 2018 grows out of the same transaction or occurrence that was the subject matter of F.E.B.'s 2012 Complaint, a matter that did not require the adding of any party.

The failure to comply with the compulsory counterclaim rule prohibits the prosecution of the instant case by the United States.

The Court should preclude the United States from claiming title to the property in issue and declare that the United States is estopped from disputing F.E.B. Corp.'s claim of title.

**Fifth Affirmative Defense**

Although laches is generally not available against the United States, laches attaches to this case as a result of the admixture of extraordinary delays in bringing the instant action given:

(1) the fact that on September 27, 1951, the United States questioned the Internal Improvement Fund's sale of the 39 acres at issue in this case ("This proposed action by the State of Florida raises the question as to whether the land in question is vested in the State or the United States.)" [Exhibit 1];

(2) in August 1956, the United States recognized that the property at issue was not "built up for federal use" and that "in previous years this Bureau has endeavored to ascertain the ownership of the island" [Exhibit 2];

(3) that in 1962 the United States resorted to condemnation of similarly situated submerged lands which were acquired via Final Judgment on Stipulation ratifying the Judgment on Declaration of Taking signed by United States District Judge David Dyer [Exhibit 3];

(4)  the United States leased the property at issue from F.E.B. in 2004, 2005 and 2006 acknowledging F.E.B.'s ownership of the property in order to seek license to use the property for training purposes [Composite Exhibit 4];

(5)  in 2011, the Bureau of Land Management made a final determination that it had no further interest in the property [Exhibit 5];

(6)    the United States failed to, in 2012, assert a compulsory counterclaim in order to resolve the disputed ownership of the property in issue.

As a result of these, and other acts and failures to act by the United States over the past 67 years, the doctrine of laches applies in this unique situation and precludes the prosecution of this case by the United States.

The Court should preclude the United States from claiming title to the property in issue and declare that the United States is estopped from disputing F.E.B. Corp.'s claim of title.

**Sixth Affirmative Defense**

The United States is equitably estopped from quieting title in its favor and from denying F.E.B.'s title by virtue of its 67 year delay in seeking to quiet title, its failure to have filed a compulsory counterclaim in *F.E.B. Corp. v. United States*, Case No.: 12-cv-10072-JEM, and assertions in that case of the 28 U.S.C. §2409a statute of limitations in order to seek to prevent F.E.B. Corp. from a forum in which to quiet title, plus its actions over 67 years, including its repeated recognition of F.E.B. Corp.'s ownership, which have been inconsistent with its claim to title of the property in issue.

The Court should preclude the United States from claiming title to the property in issue and declare that the United States is estopped from disputing F.E.B. Corp.'s claim of title.

**WHEREFORE**, F.E.B. Corp., respectfully requests that the Court deny, dismiss or otherwise enter judgment against the United States.

## COUNTERCLAIM

Defendant/Counter-Plaintiff, F.E.B. Corp., sues Plaintiff/Counter-Defendant United States, and states:

1.      F.E.B. Corp., a Florida Corporation ("F.E.B."), counter-claims and sues the United States of America for a declaratory judgment establishing that F.E.B. Corp. has title to the property in Monroe County, Florida, known as "Wisteria Island."

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1345 and/or 1346(f). A declaratory judgment is appropriate pursuant to 28 U.S.C. §2201.

3.      Venue in this District is proper. The property at issue is located in Monroe County, Florida, within the Southern District of Florida.

4.      There are no statute of limitations impediments to this action to quiet title in favor of F.E.B. Corp. The bringing of the declaratory judgment/quiet title action by the United States, combined with its failure to have asserted its claims as a compulsory counterclaim in *F.E.B. Corp. v. United States,* No.: 12-cv-10072-JEM, constitutes a waiver of sovereign immunity and a waiver of the statute of limitations for the purposes of this counterclaim which arises out of the same transaction or occurrence as the subject Complaint.

## FACTS

5.      "Wisteria Island," the subject property, contains 21.95 acres of "upland." The 17.08 surrounding acres are not "dredge spoils." This action seeks to quiet title to all of Wisteria Island covered by the deed from the Trustees of the Internal Improvement of the State of Florida (TIIF).

6.      In 1941, the Navy desired to undertake dredging in the Key West Harbor ("1940's dredging") to create a seaplane basin and make it easier for large ships to make turns on the harbor.

14

7.    Prior to the 1940's dredging, the Navy recognized that the submerged lands and any shoals, in what is now the 39-acre legal description of the property in issue were, and would be, owned by the State of Florida. *See*, Volume XXIII of the "Minutes of the Trustees of the Internal Improvement of the State of Florida," in or about October of 1941 (p. 348):

> Application was presented from Lieutenant A. J. Fay, on behalf of the United States Naval Station at Key West, Florida, *for permission to deposit fill material on certain State owned land* in the vicinity of Key West.
> Motion was made by Mr. Mayo, seconded by Mr. Lee, that the Trustees authorize permit without cost in favor of the United States *for using certain State land in the vicinity of Key West on which to deposit spoil material.*

Exhibit 6 (emphasis supplied). This application was approved, a permit issued by the State of Florida, and the Navy conducted the 1940's dredging in accordance with the granted application and permit.

8.    The TIIF minutes show that in 1941- 1944, Wisteria Island was not built up for its own use by the Navy. The Navy discarded spoil.  After Wisteria was "built up" by dredging, neither the spoil nor the built-up island were ever possessed or used in any manner by the Navy, or by any other U.S. instrumentality, other than by a written agreement that recognized F.E.B. as the owner of the property.

9.   On three occasions, when the Navy sought some use of the property, it obtained real property licenses from F.E.B. Corp. The licenses expressly acknowledged F.E.B. Corp.'s ownership of the property. See paragraph 44, *infra*.

10.   Pursuant to the TIIF permission and a permit granted by TIIF in 1941, the 1940's dredging created five spoil areas on Florida owned lands.  These areas are identified as: a) Fleming Key Spoil Area; b) Salt Pond Key Spoil Area; c) Spoil Area North of Fleming Key; d) Trumbo Point Spoil Area and e) Wisteria Spoil Area.

11.     At the time of the 1940's dredging, the Navy announced its intended uses of four of the five spoil areas to be created by the 1940's dredging, but the Navy did not announce any intended use for the Wisteria Spoil area.

12.     Immediately upon the creation, by dredging, of four of the five spoil areas, the Navy built improvements on and began to actually use them in the manner it had announced: a) Fleming Key Spoil Area was used as a munitions depot; b) Salt Pond Key Spoil Area was used for housing; c) Spoil Area North of Fleming Key was used as a location for a radar installation; and d) Trumbo Point Spoil Area was used to expand the Naval Base landside property.

13.     To this day, the Navy has continued to improve and does actually use the four named spoil areas created by the 1940's dredging.

14.     During the 1940's neither the Navy nor any instrumentality of the U.S. Government made any use of or claim to Wisteria.

15.     Recognizing that it had no legal right to title, use, nor possession of the five spoil areas created by the 1940's dredging, including the four actually in use by the Navy, upon completion of the 1940's dredging, in 1944, the Navy requested title to: a) Fleming Key Spoil Area; b) Salt Pond Key Spoil Area; c) Spoil Area North of Fleming Key; and d) Trumbo Point Spoil Area. A copy of the TIIF Minutes at which this request was made are attached as Exhibit 7.

16.     The Navy made no request for transfer of the Wisteria Spoil Area.

17.     Pursuant to the Navy's request, after proper notice and publication of a sale, on November 27, 1946, the TIIF deeded to the United States title to: a) Fleming Key Spoil Area; b) Salt Pond Key Spoil Area; c) Spoil Area North of Fleming Key; and d) Trumbo Point Spoil Area. A copy of that Deed is attached hereto as Exhibit 8.

16

18.     The Navy did not request or ever receive a deed to the Wisteria Spoil Area.

19.     On all naval maps and charts, including those prepared by the Bureau of Land Management, from 1944 to the present, Fleming Key Spoil Area, Salt Pond Key Spoil Area, Spoil Area North of Fleming Key, and Trumbo Point Spoil Area are each designated as "Naval Reserve" areas. A copy of one such official government chart is attached hereto as Exhibit 9.

20.     None of the official charts or maps, before or after 1944, show Wisteria designated as a "Naval Reserve" area. However, in a 1961 official Naval Map, Wisteria is designated as "Privately Owned." Exhibit 10.

21.     These objective, non-litigation motivated admissions and acts, described in paragraphs 7-20 above, evidence that, at the time of the 1940's dredging, the Wisteria Spoil Area was not filled in or built up by the Government "for its own use."

22.     On September 27, 1951, a Chief of the Department of the Navy, Bureau of Yards and Docks, wrote to the Trustees of Internal Improvement Fund (TIIF), State of Florida, stating, *inter alia*:

> This Bureau has been informed of the proposed sale by the State of Florida of spoil area containing approximately 39 acres located in Frankfort Bank, Key West, Monroe County, Florida.
>
> The land which is proposed for sale was created by deposits of dredged material from the main ship channel at Key West, Florida and was accomplished by the use of the Department of the Navy funds in the year 1943.
>
> This proposed action by the State of Florida raises the question as to whether the land in question is vested in the State or the United States.

The letter concluded "that the Department of the Navy considers Frankfort Bank, the shoals adjacent thereto and the spoil area in question as being the property of the United States." *See*, Exhibit 1.

23.     The proposed buyers of the property referred to by the Bureau of Yards and Docks Chief were Paul and Rita Sawyer, on behalf of Bernie Papy. On January 7, 1952, Attorney General Richard W. Ervin provided this Opinion to the Department of Agriculture Land Agent:

> I am unable to state definitively whether or not the Navy's claim is valid. However, I do think that the claim is debatable enough and so shrouded in antiquity that I think the best course would be for the Trustees to complete the sale and explain the Navy's claim to Mr. Papy and allow him to accept the Trustees' deed at his own risk. Then if litigation ensues, he will be in a position to defend the title. In this manner we can get the question of title settled one way or another in case the Navy decides to litigate this with him.

Exhibit 11. Letter of Richard Ervin, January 7, 1952.

24.     The property was sold by the Trustees of the Internal Improvement Fund *via* a Trustees deed to Paul E. Sawyer on January 9, 1952 (Exhibit 12), and then on January 28, 1952, from the Sawyers to Bernie C. Papy (Exhibit 13), then on March 28, 1958, from Bernie C. Papy and Pauline B. Papy to Amaryk Aldo (Exhibit 14); then from Amaryk Aldo and Charlotte Aldo to Wisteria Island, Inc., on April 2, 1962 (Exhibit 15); and on January 26, 1967, from Wisteria Island, Inc., to F.E.B. Corp. (Exhibit 16), the Defendant/Counter-Plaintiff in this case.

25.     In 1953, Congress enacted the Submerged Lands Act (the "SLA"), 67 Stat. 29, 43 U.S.C. §1301 *et seq*., which states in pertinent part:

> It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States [are] *recognized, confirmed, established, and vested in and assigned to the respective States ... and [their] respective grantees, lessees, or successors in interest*.
>
> ***
>
> The United States *releases and relinquishes* unto said States [and their respective grantees, lessees, or successors in interest] ... *all right, title and interest* of the United States ... to all said title, improvements, and natural resources.

43 U.S.C. §1311 (a) and (b) (emphasis supplied).

26.     The SLA defined "boundaries" and "lands beneath navigable waters" as those extending from the coastline for three marine leagues into the Gulf of Mexico when approved by Congress. 43 U.S.C. §1301(a)-(b). The SLA, consistent with Florida's 1868 federally approved Constitution, preserved and codified Florida's ownership of all he submerged lands beneath navigable waters within the State's boundaries for three marine leagues into the Gulf of Mexico. The SLA further defined all "lands beneath navigable waters" as "all filled in, made, or reclaimed lands." 43 U.S.C. §1301(a)(3).

27.     The SLA included several exceptions wherein title to submerged lands would not be recognized and confirmed to states and their respective grantees, including "*all lands filled in, built up, or otherwise reclaimed by the United States for its own use*; and any rights the United States has in lands *presently and actually* occupied by the United States." 43 U.S.C. §1313(a) (emphasis supplied).

28.     The SLA established the United States' express withdrawal and abandonment of any claims of an adverse interest, right or title to the lands beneath Florida's navigable waters, or previously dredged submerged lands, including the Submerged Lands and Wisteria Island.

29.     In 1953, the bona fide titleholder of Wisteria Island and its Submerged Lands was a private individual as the result of the 1952 purchase from the State of Florida. Wisteria Island, being privately owned through a deed issued by the State of Florida, was not retained by the United States.

30.     On August 31, 1956, the Navy Chief for the Bureau of Yards and Docks suggested that ownership of the 39 acres might be in dispute and wrote, *inter alia*, that private ownership was more likely and therefore condemnation necessary:

1. . . . In September 1951, the State of Florida through its Trustees of Internal Development Fund, advertised this island for sale although the Department of the Navy by letter to the Trustees objected to the sale upon the basis of Federal ownership. Nevertheless, the State of Florida conveyed the island to a private individual. . .

2. . . . . [T]his island is strategic … and [] private ownership thereof is extremely undesirable for security reasons. In previous years this Bureau has endeavored to ascertain the ownership of the island by correspondence with the Department of the Interior, Bureau of Land Management, and the Trustees of Internal Development Fund of Florida.

3. It is the opinion of this Bureau that: (1) if this island was built up for Federal use title to such land remains in the United States; or (2) if it cannot be established that the island was built up for Federal use the end result will be that the Navy is left ***without*** a strong argument on which to claim the island, and therefore, action to acquire this island by condemnation proceeding should be continued. *It would appear that under provision (1) above the Navy **would have a difficult time in proving that this island was built up for Federal use**, inasmuch as **the records indicate that the only reason for the establishment of the island in 1945 was a site for the deposit of spoil**. It appears, therefore, that **it will be necessary to acquire this island by condemnation proceedings.***

*See*, Exhibit 2 (emphasis supplied).

31.     The August 31, 1956 letter established that the land was a "result of the deposit of spoil from dredging operations" and not a "use" of the built-up island subject to any claim by the United States. *See*, Exhibit 2.

32.     On March 22, 1961, the Commanding Officer of United States Naval Station, Key West, Captain Morgan Harris, acknowledged that the byproduct of dredging was State of Florida property and sought a gift from the Trustees of the Internal Improvement Fund:

The enclosed Drawing No. P-3316 shows two small islands, identified as Island No. 1 and Island No. 2, located approximately fifteen hundred feet west of the U.S. Naval Station, Key West. These islands were originally created a number of years ago with Federal funds as a byproduct of harbor and channel dredging. *Under the*

*laws of the State of Florida they are State property.* They had not been improved nor are they in use now for any purpose whatsoever.

*The Navy is desirous of obtaining title to these two islands* and the surrounding tidelands, a total of 55.096 acres as shown and described on the enclosures, for a nominal fee of one dollar. It is planned to enlarge the islands and to construct additional Naval facilities thereon as an expansion of the U.S. Naval Station, Key West. This expansion would prove of benefit to both the City of Key West and to the State of Florida.

Prior to approaching the Secretary of the Navy with a formal request to proceed with this matter, it would be appreciated if the Trustees would indicate their willingness to convey title under these conditions.

Exhibit 17 (emphasis supplied). The letter establishes that the "byproduct of harbor and channel dredging," *sans* any use, is not federal land.

33.   The Trustees of the Internal Improvement Fund responded on April 3, 1961:

Dear Captain Harris:

Referring to your letter cited above, this office has ordered appraisal of the two areas which appear to aggregate 94 acres rather than 55 acres. We will be pleased to recommend conveyance at the current appraised value without competitive sale. We do not feel that we can recommend grant for a nominal consideration since the areas are held in trust for the people of the State of Florida and sale to private applicant could not be made without a base bid of the full appraised value as a starting offer for public sale. We do not feel that disposition should be recommended on a price less than would be required from citizens of this state.

Sincerely yours,
Van H. Ferguson
Director

Exhibit 18.

34.   It was decided that because State lands could not be sold by the Trustees without competitive bidding, the 55 acre tract would be condemned (*not including* that which is referred to in this litigation as Wisteria Island). An eminent domain action was instituted to take the

21

property "as a site for the deposit of spoil material. . . ." Exhibit 19. The United States affirmed

that it did not own the property. *See*, Exhibit 19, ¶¶ 6-7.  On December 27, 1961, United States

District Judge David W. Dyer entered a "Final Judgment on Stipulation" ratifying the Judgment

on Declaration of Taking, which, for $10,000, condemned the 55 acre property owned by the State

of Florida. *See*, Exhibit 3.

      35.     On May 23, 1962, Attorney General Kennedy wrote to the Secretary of the Navy:

> I have examined the title evidence and transcript of record in the condemnation proceeding entitled United States of America v. 55.096 acres of land, more or less, in the County of Monroe, State of Florida, et al., Civil No. 10-895-M, in the United States District Court for the Southern District of Florida, for use in connection with the Turning Basin of the United States Naval Station, Key West, Florida.
>
> The title evidence prepared by Louisville Title Insurance Company is in satisfactory form.
>
> The final judgment filed December 28, 1961, awarded the sum of $10,000 as the just compensation, which amount has been deposited into the registry of the court. The excess deposit of $1,570.00 was previously returned to the Treasurer of the United States on January 3, 1962.
>
> The proceeding is regular, the judgment is satisfied and the United States of America is vested with the fee simple title to the land as set forth in the opinion of this Department dated July 20, 1961.
>
> Enclosed are a certified copy of the final judgment and the title evidence.
>
>                  Sincerely yours,
>                  *Robert F. Kennedy*
>                  Attorney General

Exhibit 20.

36.     The 55 acre island which was condemned was Tank Island, now known as Sunset Key; the Navy abandoned its effort to condemn Wisteria Island; The Internal Improvement Fund never transferred the right, title or interest of the Wisteria Island spoil area to the United States.

37.     Condemnation proceedings were never brought by the United States against Wisteria Island.

38.     "The Appraisal Report" utilized to establish the price for the taking of the State property stated: "COMPARABLE SALES: No recent sales of such in-accessible State-owned land. The 39 acre Key [Wisteria Island] was sold to Aldo Amaryk and is privately owned." Exhibit 21.

39. On October 9, 1967 F.E.B. contracted with the State of Florida to acquire 125.05 acres of submerged land, barely covered by water, on Frankfort Bank immediately adjacent to the 39 acres (which 39 acres included Wisteria Island). Under applicable law, a sale of this 125.05 acres of submerged land could only be made to the lawful owner of Wisteria Island. On this date, the TIIF arranged for public notice by publication of the proposed sale "for objections only" and expressly and separately notified the United States of its proposed sale of the submerged lands adjacent to Wisteria Island to F.E.B., the owner of Wisteria Island.

40. The United States did not object to the proposed sale or F.E.B. as the owner of Wisteria. A copy of the August 9, 1967 TIIF Notice to the United States of the proposed sale is attached hereto as Exhibit 22.

41. On December 15, 1972, the TIIF issued F.E.B. a Trustees' Deed to the 125.05 acres. The United States did not object to the issuance of this deed and to this day has made no claim or challenge to F.E.B.'s ownership of the 125.05 acres.

42.     F.E.B.'s right, title and interest in the property have been repeatedly acknowledged by the actions and statements of pertinent State, local and federal authorities. For sixty-seven years, F.E.B. and its predecessors-in-interest have enjoyed unfettered use and control of the property, as well as having openly exercised all rights of ownership thereof.

43.     Since obtaining title in 1967, F.E.B. has: (i) paid all real estate taxes and assessments levied on Wisteria Island by Monroe County, Florida; (ii) filed Federal and State income tax returns disclosing its ownership of Wisteria Island; (iii) complied with all State and Federal laws and rules relating to ownership of Wisteria Island – including the installation of, and maintenance of, "no trespassing" signs on Wisteria Island. F.E.B. Corp. has been granted Monroe County permits for improvements to the property, Comprehensive Plan Approvals, and other acknowledgments of ownership by local, state and federal authorities.

44.     In 2004, 2005 and 2006, the United States acknowledged its lack of ownership and interest in the Submerged Lands and Wisteria Island when the Navy SEAL Vehicle Delivery Team TWO (the "SEAL Team") entered into three separate License Agreements for the Use Of The Property (the "License Agreements"). See, Composite Exhibit 4.  In the Preamble to the License Agreements, the United States expressly stated that F.E.B. was the legal owner of Wisteria Island, and would, therefore, act as the LICENSOR. In further acknowledgment of F.E.B.'s right and title to the Submerged Lands, the SEAL Team agreed to permit F.E.B. to seek damages against the United States for any damage resulting from the SEAL Team's use of the property. *Id*.

45.     In 2011, the Florida Fish and Wildlife Commission arrested, and the State Attorney charged, a person found illegally trespassing on F.E.B.'s private property, the property being Wisteria Island. Neither the United States nor any agency thereof intervened in the criminal

24

proceedings or made any adverse claim of interest against the Wisteria Island's private property status.

46.    In August 2011, the United States confirmed "Wisteria … Island … was never considered to be part of the public domain of the United States. . . ." *See*, Exhibit 5, letter of Anne Morkill, U.S. Fish and Wildlife Services, confirming that "the BLM (confirmed again yesterday), they have made a final determination that the creation of Wisteria Island was not a natural occurrence (created by dredged material), the island was never considered to be part of the public domain of the United States."

47.    In November 2011, an unauthorized, unsanctioned, and unapproved letter from a low level BLM employee asserted legal title was in the United States, contrary to established understanding of the applicable law, and the long recognition by the BLM and others of F.E.B.'s ownership. Said letter contravened the historical and legal principles which, since the advent of the deed, rendered ownership of the subject property unto F.E.B. Corp.

48.    F.E.B.'s present interest in the Submerged Lands and Wisteria Island follows an unbroken chain of title starting from the January 9, 1952 deed between the Internal Improvement Fund and Paul E. Sawyer to the present title holder, F.E.B. Corp. See paragraph 24, *supra*.

## CAUSE OF ACTION FOR DECLARATORY JUDGMENT

49.    Defendant/Counter-Plaintiff F.E.B. Corp., incorporates and realleges herein paragraphs 1-43 above.

50.    There exists between the parties an actual controversy within this Court's jurisdiction.

51.     The United States Court of Appeals for the Eleventh Circuit held in *F.E.B. Corp., v. United States*, 818 F.3d 681 (11th Cir. 2016), that the Quiet Title Act, 28 U.S.C. §2409a twelve year statute of limitations precluded F.E.B. from maintaining a quiet title action and affirmed the dismissal of F.E.B.'s Complaint against the United States.

52.     That Court continued:

> In doing so, we note that the dismissal "does not quiet title to the property in the United States. The title dispute remains unresolved." *Block* [*v. North Dakota Bd. of Univ. and School Lands*] 461 U.S. [273] at 291.

*F.E.B. v. United States*, 818 F.3d at 693-694. The United States by its invocation of this action, and its failure to assert a compulsory counterclaim in Case No.: 12-cv-10072-JEM in this Court, has waived the statute of limitations and sovereign immunity with regard to this dispute.

53.     This action for declaratory judgment is a compulsory counterclaim and seeks a declaration that F.E.B. Corp., has title to the Wisteria Island property.

**WHEREFORE**, F.E.B. Corp., respectfully requests the entry of a declaratory judgment in its favor, and such other further and necessary relief as may be proper, pursuant to 28 U.S.C. §2202.

Respectfully submitted,

By: *Bruce S. Rogow*
BRUCE S. ROGOW
FL Bar: 067999
TARA A. CAMPION
FL Bar: 90944
**BRUCE S. ROGOW, P.A**.
100 N.E. 3rd Ave., Ste. 1000
Fort Lauderdale, FL 33301
Telephone: (954) 767-8909
brogow@rogowlaw.com
tcampion@rogowlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 9, 2019, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record or pro se parties, via transmission of Notices of Electronic Filing generated by CM/ECF.

*Counsel for the Government*

ANTHONY ERICKSON-POGORZELSKI
**U.S. ATTORNEY'S OFFICE – CIVIL**
99 NE 4th Street
Suite 335
Miami, FL 33132
Ph: 305-961-9296
Fax: 305-530-7139
Anthony.pogorzelski@usdoj.gov

27

**EXHIBIT LIST TO ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

| | |
|---|---|
| 1 | September 27, 1951 letter from Chief of the Department of the Navy, Bureau of Yards and Docks to Trustees of Internal Improvement Fund |
| 2 | August 31, 1956 letter from Navy Chief for the Bureau of Yards and Docks to the Chief of Naval Operations |
| 3 | 1962 condemnation Final Judgment on Stipulation signed by United States District Judge David Deyer |
| 4 | Composite – Navy Seal Leases from 2004, 2005, 2006 |
| 5 | 2011 Bureau of Land Management final determination email |
| 6 | See, Volume XXIII of the "Minutes of the Trustees of the Internal Improvement of the State of Florida," in or about October of 1941 (p. 348) |
| 7 | See, Volume XXIV of the "Minutes of the Trustees of the Internal Improvement of the State of Florida," in or about December 31, 1944 (p. 826-828) |
| 8 | November 27, 1946 TIIF deed to United States to Fleming Key Spoil Area, Salt Pond Key Spoil Area, Spoil Area North of Fleming Key, and Trumbo Point Spoil Area |
| 9 | Government chart showing Spoil Areas designated as "Naval Reserve" |
| 10 | Naval chart showing Wisteria designated as "Privately Owned" |
| 11 | January 7, 1952 Opinion Letter from Attorney General Richard W. Ervin to the United States Department of Agriculture Land Agent |
| 12 | Deed from Trustees of Internal Improvement Fund to Sawyers |
| 13 | January 9, 1952 Wisteria Deed from Sawyers to Bernie C. Papy |
| 14 | March 28, 1958 Wisteria Deed from Bernie C. Papy and Pauline B. Papy to Amaryk Aldo |
| 15 | April 2, 1962 Wisteria Deed from Amaryk Aldo and Charlotte Aldo to Wisteria Island, Inc. |
| 16 | January 25, 1967 Wisteria Deed from Wisteria Island, Inc. to F.E.B. Corporation |

| 17 | March 22, 1961 letter from Captain Morgan Harris, the Commanding Officer of United States Naval Station, Key West, to the Trustees of the Internal Improvement Fund |
|----|----|
| 18 | April 3, 1961 response to Captain Harris from the Trustees of the Internal Improvement Fund |
| 19 | Eminent Domain Complaint |
| 20 | May 23, 1962 letter from Attorney General Robert F. Kennedy to the Secretary of the Navy |
| 21 | Appraisal Report |
| 22 | August 9, 1967 Trustees of the Internal Improvement Fund Notice to the United States |