UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 18-10203-CIV-MARTINEZ/OTAZO-REYES

UNITED STATES OF AMERICA,

    Plaintiff,

v.

F.E.B. CORP.,

    Defendant.
_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** comes before the Court on cross-motions for summary judgment filed by Plaintiff, United States of America (DE 35) and Defendant, F.E.B. Corp. (DE 38). The Court has carefully reviewed the motions, responses and replies thereto, and is otherwise fully advised in the premises. For the reasons set forth below, Plaintiff's motion is **GRANTED** and Defendant's motion is **DENIED**.

    **I.**    **FACTS**

The United States sued F.E.B. Corp. ("F.E.B.") under the Declaratory Judgment Act to resolve a title dispute between the United States and F.E.B. concerning approximately 39 acres of land off the coast of Key West, Florida. That property is presently known as Wisteria Island.

This lawsuit follows the Eleventh Circuit's affirmance of this Court's earlier dismissal of FEB's action to quiet title to the island. *F.E.B. Corp. v. United States*, 818 F.3d 681 (11th Cir. 2016) ("*F.E.B. I*"). There, the appellate court agreed that F.E.B.'s action was barred by the statute of limitations but "note[d] that the dismissal [did] not quiet title to the property in the United States.

The title dispute remains unresolved." *Id*. at 693–94 (quotations and citation omitted). The United States filed the present action to settle the title dispute once and for all.

"Both parties maintain, by way of their respective motions, that this case can be resolved on summary judgment" (DE 53: 2) and do not contest the following facts. As set forth previously:

> The island in question, known as Wisteria Island (or "the island"), is situated in the Gulf of Mexico, less than a mile off the coast of Key West, Florida. It is not a natural island, but rather was formed as a result of dredging operations performed under the auspices of the United States Navy ("Navy") in nearby Key West Harbor during the first half of the nineteenth century. As Navy contractors deepened the channels in the harbor to improve shipping and aviation access, they deposited the dredged material on a nearby plot of submerged land. The accumulations eventually rose above sea level. A substantial dredging project in 1943 made the thirty-nine-acre (later-named) Wisteria Island what it is today.
>
> In 1951, the state of Florida issued notice of its intention to sell Wisteria Island. The United States objected to the sale of the island on the grounds that the island belonged to the United States. In a letter to the state, the United States traced its ownership of the island and surrounding area to an 1819 treaty with Spain, as confirmed by subsequent 1845 and 1924 Executive Orders. The United States concluded, "In view of the foregoing [Florida is] informed that the Department of the Navy considers . . . the spoil area in question as being the property of the United States. It is, therefore, requested, that no further action be taken . . . to dispose of the spoil area in question by sale or otherwise."
>
> In his own letter to the state, Florida's attorney general acknowledged the United States' claim, but expressed doubt as to its validity, opining:
>
>> I am unable to state definitively whether or not the Navy's claim is valid. However, I do think that the claim is debatable enough and so shrouded in antiquity that I think the best course would be for [Florida] to complete the sale and explain the Navy's claim to [the buyer] and allow him to accept the . . . deed at his own risk . . . . In this manner we can get the question of title settled one way or other in case the Navy decides to litigate with him.
>
> Accordingly, in 1952, Florida sold the island to a private party via a quitclaim deed that contained no warranties of title.
>
> One year later, Congress enacted the Submerged Lands Act ("SLA"), 43 U.S.C. §§ 1301–1315, which, broadly speaking, granted the states ownership of submerged lands within three miles of their coastlines, subject to certain exceptions. In the years that followed, the United States did not reassert its claim to Wisteria Island. Title passed from private owner to private owner until F.E.B. acquired the island in

>1967. The federal government appeared to acquiesce to F.E.B.'s ownership, and even entered into licensing agreements with F.E.B. to use the island as a Navy training ground from 2004 to 2006.
>
>In 2011, however, the United States once again asserted ownership over Wisteria Island. F.E.B. filed . . . suit under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, to establish ownership of the island . . . . The district court, however, did not reach the merits of F.E.B.'s SLA claim in this quiet title action.

*F.E.B. I*, 818 F.3d at 684–85 (footnotes omitted) [1]; (*see also* DE 36, United States' Statement of Material Facts ¶¶ 1-3, 34, 37-42, 52, 54, 68; DE 39, F.E.B.'s Statement of Material Facts ¶ 1). Pending before the Court are cross-motions for summary judgment on the merits of the title dispute. This matter is now ripe for adjudication.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In making this determination, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1317–18 (11th Cir. 2015) (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997)).

---

[1] *F.E.B. I* was decided in a summary judgment posture and the parties stipulate that the record in the prior case (No. 12-cv-10072-JEM) is incorporated into this case (DE 28). Although here F.E.B. relies substantially on expert interpretation of historical records to trace the evolution of the property since 1845, (DE 38-12), historical disputes preceding the Navy's dredging project of 1941-1943 are outside the scope of this Order. Accordingly, the Court recites the undisputed facts as framed by the Eleventh Circuit in *F.E.B. I*.

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. See *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438 (11th Cir. 1991). Once this initial burden is met, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). But if the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. <u>ANALYSIS</u>

To resolve the ownership dispute over Wisteria Island the Court must consider the applicability the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301–1315. Straightforwardly, the SLA provides that "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States . . . are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States." *Id.* § 1311(a). Importantly, however:

> ***Excepted from the operation of section 1311 of [the SLA is]*** (a) all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State; all lands expressly retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea); all lands acquired by the

> United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity; ***all lands filled in, built up, or otherwise reclaimed by the United States for its own use***; and any rights the United States has in lands presently and actually occupied by the United States under claim of right . . . .

*Id.* § 1313 (emphasis added). Due to factual disputes over the historical origins of Wisteria Island, for summary judgment purposes the parties focus on the "filled in . . . for its own use" exception of § 1313(a). (DE 35: 6 n. 9). In this connection, both sides agree that Wisteria Island was "filled in" as a spoil deposit in conjunction with a dredging project in Key West Harbor from 1941-1943 conducted under the auspices of the Navy.

The only interpretative task for this Court, accordingly, is to determine whether the island's incidental but deliberate creation was "for its own use." In considering this question, the Court is guided by the tenet that "Congress used the words of the statute as they are commonly and ordinarily understood and [courts] must construe the statute so each of its provisions is given full effect." *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995). "Absent an ambiguity, the statute's plain meaning prevails." *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am., Inc.*, 32 F.3d 528, 531 (11th Cir. 1994). Applying the plain words of the statute, as they are commonly and ordinarily understood, Court concludes that the filling in of a spoil area to facilitate Naval dredging operations counts as "lands filled in . . . by the United States for its own use." *Id.* §1313(a).

This Court's conclusion is fortified by the Eleventh Circuit's precedent in *F.E.B. I*. In that case, which is the precursor to this matter, the appellate court addressed whether the "SLA abandoned the federal government's previously-expressed claim to the (formerly submerged) Wisteria Island, which in turn effectively reset the [Quiet Title Act's] statute of limitations period for that island." 818 F.3d at 688. The court determined that it did not, reasoning that "the circumstances of Wisteria Island's creation hew closely enough to the 'for its own use' exception

5

to the SLA to preclude a finding that the SLA clearly and unequivocally abandoned the federal government's interest in that island." *Id.* at 689. In reaching its conclusion, the Eleventh Circuit invoked "the Supreme Court's only treatment of the exception" in *California ex rel. State Lands Comm'n v. United States* ("*California II*"), 457 U.S. 273 (1982) and further explained:

> In *California II*, the Supreme Court stated in dicta that the SLA exception for land built up by the United States "for its own use" would apply to coastline that had slowly accreted after the United States constructed jetties nearby, even though the accretion was inadvertent, and the resulting coastline had remained barren and unused for the first eighty years of its existence. *Id.* at 275–76, 287. That result, the Supreme Court reasoned, "follow[ed] from the congressional object to assure each sovereign the continuing benefit of landfill and like work performed by each." *Id.* at 287. <u>**Wisteria Island surely was both created and used for a more functional purpose than the inadvertent accretions at issue in California II**</u>.

*Id.* at 689-690 (footnotes and parallel citations omitted).

The parties quarrel about whether the Eleventh Circuit's conclusion—that the creation and use of Wisteria Island had a functional purpose squarely within the ambit of the "for its own use" exception of § 1313(a)—is binding precedent or mere dicta. However, this debate is beside the point. The Supreme Court's dicta *in California II*, and the Eleventh Circuit's reasoning in *F.E.B. I* are, at minimum, highly persuasive authorities that fit together with a commonsense reading of the statute, and F.E.B. has not provided the Court a sound basis to depart from them.

In this connection, F.E.B. deploys two arguments, which it claims are supported by the SLA's legislative history. First, F.E.B. distinguishes *California II*, emphasizing that that case "did not involve an 'offshore spoil deposit,' it involved only accretions to existing Government lands." (DE 51: 2). F.E.B. implies that the distinction is legally significant because *California II* was supposedly predicated on legislative commentary that "embraced" the idea that spoil deposits must be adjunct to inland military improvements or installations to fall within the "for its own use" exception of §1313(a). (DE 51: 5). F.E.B. next argues that the phrase employed by the Eleventh

6

Circuit in *F.E.B. I* ("Wisteria Island was . . . created and used") is distinct from the phrase that appears in §1313(a) ("filled in . . . for its own use"), which F.E.B. contends is forward-looking and can only be triggered by a "subsequent use" pursuant to legislative history and rules of statutory construction. (DE 51: 3-4; 38: 24-26).

Initially, it must be pointed out that both arguments are not merely supported by legislative history but entirely dependent upon it. Thus, the principal strength of both arguments is simultaneously their biggest weakness because "[w]here the meaning of a statutory provision is clear, that language is the sole indication of legislative intent." *Am. Bankers Ins. Co. of Fla. v. United States*, 265 F. Supp. 67, 74 (S.D. Fla. 1967), *aff'd*, 388 F.2d 304 (5th Cir. 1968); *see also Coggin Auto. Corp. v. Comm'r*, 292 F.3d 1326, 1332 (11th Cir. 2002) ("When the terms of a statute are clear, its language is conclusive and courts are not free to replace that clear language with an unenacted legislative intent.") (alteration omitted).

Put simply, the SLA is clear on its face, and does not include a future-use requirement. And neither the SLA nor the Supreme Court's dicta in *California II* make reference to a near-shore military improvement or installation requirement. Rather, the Supreme Court merely recognized "the congressional object to assure each sovereign the continuing benefit of landfill and like work performed by each." *California II*, 457 U.S. at 287. And, as the Eleventh Circuit opined in *F.E.B. I*, that reasoning compels the conclusion that the Wisteria Island property was filled in for the use of the United States with even greater force than the unintended accretions in *California II* which remained barren for 80 years. Notably, F.E.B. fails to cite a single case from any jurisdiction, in any context, supporting its interpretation of the language "for its own use."

Having concluded that the language of §1313(a) is unambiguous, the Court further rejects the "expert testimony" proffered by F.E.B. (DE 38-44, 38-45). Linguists, legal lexicographers, and

7

grammarians are not relevant experts in a property ownership dispute. Statutory interpretation is within the exclusive purview of the Court.² More significantly, if any ambiguity existed in the SLA, the Court would be required to construe the statute "strictly in favor of the United States." *F.E.B. I*, 818 F.3d at 689; *see also United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116 (1957) (recognizing the "established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." (citing *Caldwell v. United States*, 250 U.S. 14, 20-21 (1919)).

In any event, the Court notes that the interpretation offered by F.E.B.'s expert that the "filled in" and "use" requirements of §1313(a) are two distinct events such that the Government was required to make further use of the island beyond filling in, otherwise the phrase "for its own use" would constitute surplusage, is not correct. (DE 38: 25). The first problem for F.E.B. is that there ***was*** a use beyond filling in: dredging. Secondly, even if there were no other use beyond filling in, F.E.B.'s construction would still not be correct because it overlooks the additional meaning of the phrase "for its own use," which dictates, very simply, that the filling in must have been for the benefit of the Government (rather than another entity such as the State). If the phrase "for its own use" were eliminated, that meaning would be lost and therefore it cannot be surplusage, as posited by F.E.B.

F.E.B.'s further suggestion that the word "for" within the phrase "filled in . . . for its own use" contemplates use beyond filling in, and that "creation is not use" according to lexical meaning, is similarly unavailing. (*Id*.: 25-26). As previously set forth, the filling in of the spoil deposit in this case was used to advance a dredging project. *See F.E.B. I*, 818 F.3d 688 ("Wisteria

---

² These witnesses are accordingly stricken.

Island's origin is undisputed: It was built up by Navy contractors, who used the land for the government's purpose and benefit of storing fill accumulated from nearby dredging operations."). Creation was not the use. Dredging was the use.

For all of these reasons, the Court concludes that Wisteria Island belongs to the United States pursuant to the "filled in . . . for its own use" exception of §1313(a). The Court has considered the remainder of F.E.B.'s arguments and finds them to be without merit.

### IV. CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment (DE 35), is **GRANTED**, and Defendant's Motion for Summary Judgment (DE 38), is **DENIED**. Plaintiff's Motion to Strike (DE 37) is **GRANTED**. The Clerk shall mark this case **CLOSED** and **DENY AS MOOT** any pending motions. The United States is directed to file papers necessary to conclude this action, including a proposed final judgment, no later than **August 10, 2020**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 31st of July, 2020.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE